UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY REED,

        Plaintiff,                                Case No. 1:11-cv-273

v.                                                   HON. JANET T. NEFF

CORLETT-TURNER ACQUISITION, INC.,
and CORLETT-TURNER CO.,

        Defendants.
_____/

## OPINION

Now pending before the Court in this gender discrimination case is a September 24, 2012 Motion for Summary Judgment filed by Defendants Corlett-Turner Acquisition, Inc. and Corlett-Turner Co. (Dkt 99). Plaintiff Mary Reed filed a response in opposition to Defendants' motion (Dkt 110), and Defendants filed a reply (Dkt 107). The parties have also since filed a Motion to Strike (Dkt 108) and a Motion for Default Judgment (Dkt 119) based on the motion papers. Having conducted a Pre-Motion Conference in this matter and having now fully considered the parties' written briefs and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court concludes that these three motions are properly denied.

### I. BACKGROUND

Defendant Corlett-Turner Co. (hereinafter sometimes "the company") has supplied the automotive industry with precision-machined parts since the 1940s (Johnson Dep. [Pl. Ex. A, Dfs.

Ex. 3] at 17). Defendant Corlett-Turner Co. hired Plaintiff as a machine operator in March 1979 (Compl. ¶ 7). She was eventually promoted to the position of Quality Control Manager at its Zeeland, Michigan facility (*id.* ¶ 8; Pl. Dep. [Pl. Ex. C, Dfs. Ex. 6] at 40-41). Plaintiff alleges that she was "fully qualified" for her job position and performed her job "for years without any disciplinary problems or criticisms of her work performance" (*id.* ¶ 9). Eric Johnson, the Vice President of Engineering to whom Plaintiff directly reported, agreed that Plaintiff "by and large" performed her job (Johnson Dep. at 54). At the time of her termination, Plaintiff was the only female in a position of management (Klynstra Dep. [Pl. Ex. F, Dfs. Ex. 4] at 17-18; Hooker Dep. [Pl. Ex. K, Dfs. Ex. 7] at 15; Pl. Dep. at 66-67).

In June 2008, after Corlett-Turner Co. was acquired by another company, G. A. Richards, it carried on its business operations under the name Corlett-Turner Acquisition, Inc., with Jesse Massengill as its new President (Compl. ¶ 11; Massengill Dep. [Pl. Ex. E, Dfs. Ex. 1] at 27; Johnson Dep. at 19). Johnson, Plaintiff's supervisor, reported to Massengill (Klynstra Dep. at 51). Plaintiff alleges that Massengill stated, on numerous occasions after his arrival, that the Zeeland facility was a "man's shop" (Compl. ¶ 11).

At some point in the "winter of 2008-09," James Barker, a then recently-unemployed quality engineer from another precision machined-parts manufacturer, stopped at the company and expressed his interest in a quality engineering position (Barker Dep. [Dfs. Ex. 5] at 23). Johnson subsequently requested Barker supply him with his resume (*id.*). Per his December 10, 2008 email to a G.A. Richards colleague, Massengill was "working on finding a replacement for Mary Reed" (Pl. Ex. H).

On January 5, 2009, Defendant terminated Plaintiff's employment, allegedly as a reduction in force (RIF) that eliminated 18 positions (Compl. ¶ 12; Massengill Dep. at 79). Plaintiff, the only female in management, had been the only manager not "drawn into" the meetings to discuss downsizing the company and the only manager whose employment was terminated (Klynstra Dep. at 31; Pl. Dep. at 104-05).

On March 2, 2009, Defendant hired Barker as Quality Control Manager, and Barker took over the job duties Plaintiff had been performing before her termination (Pl. Ex. Q, Quality Manager Offer Letter; Johnson Dep. at 54-55; Klynstra Dep. at 26, 46; Hooker Dep. at 27-28). Engelsman, one of the employees Plaintiff supervised, testified that "[w]e thought it was him [being hired to replace Plaintiff] because he kept appearing in the shop" after Plaintiff's termination (Engelsman Dep. [Pl. Ex. P, Dfs. Ex. 9] at 36). Another of Plaintiff's subordinates, Carolyn Palmer, similarly testified that "they were interviewing Jim Barker a few months before Mary was let go" (Palmer Dep. [Pl. Ex. J, Dfs. Ex. 8] at 29-33).

On March 18, 2011, Plaintiff initiated this suit against Defendants (Dkt 1). She alleges gender discrimination under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2101 *et seq.* Following discovery, this Court conducted a Pre-Motion Conference in June 2012 on the parties' proposed dispositive motions. This Court issued a briefing schedule on Defendant's proposed dispositive motion concerning liability and deferred briefing on Plaintiff's proposed dispositive motion concerning mitigation of damages. The parties filed their motion papers in September 2012 (Dkts 99-119). The parties attempted an Early Settlement Conference in October

2012, which was ultimately unsuccessful, necessitating resolution of these three pending motions before the Settlement Conference noticed for next month.

## II. ANALYSIS

### A.  Defendants' Motion for Summary Judgment

A motion for summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Here, Plaintiff presents her claim of age discrimination under both federal and state law. Title VII provides that it shall be unlawful for an employer to discriminate against any individual with respect to the individual's "compensation, terms, conditions or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 200e-2(a)(1).  Similarly, Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of ... sex ...."  MICH. COMP. LAWS § 37.2202(1)(a).

"'The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing*

4

*Prods.*, *Inc.*, 530 U.S. 133, 153 (2000)). A plaintiff must offer "direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Suits v. The Heil Co.*, 192 F. App'x 399, 400 (6th Cir. 2006) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003)). Plaintiff proceeds under both theories.

**1.      Direct Evidence**

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). If a plaintiff succeeds in presenting direct evidence of a discriminatory motive, then "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) (quotation omitted).

Here, Plaintiff relies on the testimony of five separate witnesses, each of whom report hearing Massengill state—on five separate occasions—that the company was a "man's shop" and/or that working for the company was a "man's job" (Pl. Dep. at 114-15; Palmer Dep. at 16-19; Engelsman Dep. at 30; Hooker Dep. at 20-21; Johnson Dep. at 38). The number of remarks belies Defendant's contention that these were merely "stray remarks" (Dkt 100 at 24-29); rather, the multiple remarks, made to a wide audience that included not only Plaintiff and her three female department employees (Carolyn Palmer, Diane Engelsman and Thea Hooker) but also Vice President Johnson, serve to buttress one another.

Furthermore, the Court is not persuaded by Defendant's contention that the "man's shop" comments are ambiguous (Dkt 100 at 29-30). The absence of a direct nexus to Plaintiff does not

necessarily render a discriminatory remark irrelevant. *See, e.g., La Pointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) (holding that the supervisor's ageist remarks about "oldtimers" constituted direct evidence of age discrimination even though the comments were not specifically about or directed to the plaintiff).

Nor is the Court persuaded by Defendant's opinion that Massengill's remarks are not of the same character as those examined in "real" discrimination cases (Dkt 100 at 29-30). Diane Engelsman's testimony, in particular, demonstrates the discriminatory context of at least one of Massengill's "man's shop" comments, which Engelsman remembered Massengill making "more likely than not" within a month of Plaintiff's termination (Engelsman Dep. at 44). Engelsman, one of the employees in Plaintiff's department, testified the following:

> Right after it was clear that they had been bought, we asked for a meeting to find out where we all stood as—'cause some people like HR had been let go. People had been let go that were in management. We wanted to know where we stood as a company or as a—as a department in the company, where did we stand? Were we going to be slimmed down? Were there [sic] G.A. Richard employees going to take over? And different parts had been allowed to go to their company people like the treasurer, and stuff like that. And so, we asked for a meeting, and I just remember Jess [Massengill] saying, well, it's a man's shop.

(*id.* at 30-31). Engelsman testified that she thought the remarks by Massengill indicated his belief that women "had their place" in the company and that their place "wasn't anywhere in management" (*id.* at 45). For his part, Massengill testified that "if she heard me say anything at all, okay, it was that it's a manly business" (Massengill Dep. at 57), although Massengill also conceded it was "possible" he may have made the comment more than once (*id.* at 58).

In sum, while the Court expresses no opinion on the truth of Plaintiff's allegations or the deposition testimony upon which she relies, the Court determines that Plaintiff's evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in

Defendant's decision to terminate her employment. Should a jury trial be necessary in this case, the "credibility determinations are for the jury." *Wells v. New Cherokee Corp.*, 58 F.3d 233, 237 (6th Cir. 1995) (quoting *Wheeler v. McKinley Enterprises*, 937 F.2d 1158, 1162 (6th Cir. 1991)).

**2. Circumstantial Evidence**

Even if the Court did not determine that Plaintiff's direct evidence allowed an inference of discriminatory treatment, the Court also determines that Plaintiff has made a prima facie case on a disparate treatment theory using circumstantial evidence. Under the four prongs of the well-known test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), Plaintiff must show that (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was treated less favorably than a non-protected employee. *See Taylor v. Union Inst.*, 30 F. App'x 443, 447-48 (6th Cir. 2002). "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) (quoting *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)).

    a. *Protected Class & Adverse Employment Action Prongs*

The parties do not dispute that Plaintiff is a member of the protected class or that her termination constitutes an adverse employment action. Thus, two prongs of Plaintiff's prima facie case are satisfied. Defendants dispute whether Plaintiff has satisfied the remaining two prongs.

    b. *Qualified Prong*

In *Wexler v. White's Fine Furniture*, Inc., 317 F.3d 564, 575 (6th Cir. 2003), the Sixth Circuit Court of Appeals sitting en banc "explicitly set forth" what is required for a plaintiff to satisfy the qualification prong of the prima facie test. Specifically, the Court opined that "[a]t the

prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Id.* "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 575-76. A court may "not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when it is analyzing the plaintiff's prima facie case." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010) (citing *Wexler, supra*); *see also Bailey v. Papa John's USA, Inc.*, 211 F. App'x 417, 420 (6th Cir. 2006) (explaining that a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case as this would bypass the burden-shifting analysis).

Defendants emphasize that "[i]n Corlett's new owner's judgment, Plaintiff was unqualified for the position" (Dkt 100 at 12). However, based on the case law set forth above, Plaintiff, a company employee since 1979, should not be considered unqualified because of her purported failure to meet the new owner's expectations. Plaintiff expressly testified about the certifications she obtained necessary for her promotion to management (Pl. Dep. at 32-33), and neither the new owner (Massengill) nor her immediate supervisor (Johnson) testified that she was not qualified for the position (Massengill Dep. at 48; Johnson Dep. at 54). Looking at the evidence in the light most favorable to Plaintiff and independent of Defendants' proffered nondiscriminatory reason, the Court determines that Plaintiff possessed the minimum objective qualifications for employment in her

8

field. *See, e.g., Geiger*, 579 F.3d at 624 (finding plaintiff was qualified for the job where he had already served in that position, had 27 years experience, and had received positive reviews). Therefore, the qualification prong is also satisfied.

        c.        *Less Favorable Treatment Prong*

In employment discrimination cases in which the defendant puts forward workforce reduction as its legitimate business reason for the adverse employment decision, "a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Suits*, 192 F. App'x at 404 (quoting *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)); *see also La Grant v. Gulf and Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984) ("[t]he mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination.").

The parties vehemently disagree as to whether Plaintiff's termination was part of a work force reduction. "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Bell v. Prefix, Inc.*, 321 F. App'x 423, 428 (6th Cir. 2009) (quoting *Schram v. Schwan's Sales Enters., Inc.*, 124 F. App'x 380, 384 (6th Cir. 2005)). Here, the company's former owner, Harry Armstrong, testified that "[t]here were no job titles going to be eliminated" (Armstrong Dep. [Dfs. Ex. 2] at 34). Massengill testified that there were no job positions, "other than the quality manager job," which were completely eliminated during the purported workforce reduction (Massengill Dep. at 64).

9

Even assuming arguendo the existence of a workforce reduction within the meaning of the case law, Plaintiff has proffered sufficient evidence to satisfy this last prong of her prima facie case, too. "An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Barnes*, 896 F.2d at 1465. Defendants assert that Plaintiff was never replaced, that her job duties were distributed to Johnson (Dkt 100 at 12-17), but Plaintiff offers persuasive evidence to the contrary. Specifically, Plaintiff's evidence demonstrates that as early as December 10, 2008, approximately one month before her employment was terminated, Defendant was "working on finding a replacement for Mary Reed," had actively sought an application from James Barker, and hired Barker with the same job duties, salary and benefits as Plaintiff enjoyed. Therefore, Plaintiff's circumstantial evidence satisfies this last prong of her prima facie case, too.

**2.     Legitimate, Nondiscriminatory Reason**

Once a plaintiff satisfies her prima facie burden, either through direct or circumstantial evidence, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Minadeo, supra; Suits*, 192 F. App'x at 400. "[T]he defendant bears only the burden of production, not the burden of persuasion, in that the defendant must merely 'articulate a valid rationale' for the adverse employment action." *Taylor*, 30 F. App'x at 448 (quoting *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996)).

Here, Defendants assert that they terminated Plaintiff as part of a reduction in force necessitated by the downturn in the economy. Plaintiff's January 5, 2009 "Separation Record" identifies "Loss of work, Economic shrinkage in economy" as the explanation for her separation from the company (Dfs. Ex. 24). However, as the Sixth Circuit has emphasized, "[t]he financial crisis rationale explains why an adverse employment action occurred, not why it occurred to [a

particular plaintiff]." *Taylor*, 30 F. App'x at 448 (quoting *Tye v. Bd. of Educ. of the Polaris Joint Vocational Sch. Dist.*, 811 F.2d 315, 319 (6th Cir. 1987)). The defendant in an RIF case must still offer a non-discriminatory reason "'why someone else was preferred.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

In this regard, Defendant specifies that Plaintiff's work was particularly affected by the drop in company orders and that Plaintiff was doing "little more than sorting and inspection of parts, as opposed to developing quality plans or performing any managerial duties" (Dkt 100 at 19). Defendant asserts that its decision to terminate Plaintiff (and save her salary) "hinged directly on the demands of the Quality Department and Corlett's ability to meet customer demands using its other employees in that department" (*id.* at 20). Armstrong testified that the decision to terminate Plaintiff resulted in the company receiving the best "bang for the buck" as they could avoid "pay[ing] somebody to do a job that really is a 9.50 an hour job, versus, you know, a $55,000 a year job" (Armstrong Dep. at 94). Armstrong opined that Plaintiff's skill set was "[not] needed at that particular time" (*id.* at 95). The Court finds Defendants have satisfied their burden of articulating a legitimate non-discriminatory reason.

**3.    Pretext**

The burden thus shifts back to Plaintiff to produce enough evidence to allow a reasonable jury to infer that Defendant's proffered reason is pretextual and that she was actually fired because of her gender. "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler,* 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231

F.3d 1016, 1021 (6th Cir. 2000)). In other words, Plaintiff must "produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendants ... did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 579 (6th Cir. 2012) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)).

Again, Plaintiff offers persuasive evidence that as early as December 10, 2008, approximately one month before her employment was terminated, Defendant was "working on finding a replacement for Mary Reed," had actively sought an application from James Barker, and hired Barker six to seven weeks after her departure, with the same job duties and *same salary* and benefits as Plaintiff previously enjoyed (Pl. Ex. Q, Quality Manager Offer Letter). Plaintiff's evidence sufficiently belies the "savings" Defendants claim to have gained from terminating her employment. Plaintiff herself testified that the economic downturn had not affected her department's quality control tasks, that "we still had the same requirements as we always had to check the parts on the line to make sure that the product that went out the door was good" (Pl. Dep. at 61). In conjunction with Massengill's multiple statements to several employees revealing his discriminatory goal of presiding over a "man's shop," Plaintiff's evidence of pretext supports an inference of gender-based discrimination in this case. *See Brooks v. Davey Tree Expert Co.*, 478 F. App'x 934, 944 (6th Cir. 2012) ("[M]ultiple discriminatory remarks ... buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998)).

In sum, the record, taken as a whole and viewed in the light most favorable to Plaintiff, would allow a reasonable jury to disbelieve the reason given for Plaintiff's termination and infer that

Plaintiff was instead terminated because of her gender. While the evidence does not require such a conclusion, all that is required to survive summary judgment is sufficient evidence to permit a reasonable trier of fact "to infer the ultimate fact of intentional discrimination." *See Hale v. ABF Freight Sys., Inc.*, No. 11-6440, 2012 WL 5259156, at *8 (6th Cir. Oct. 25, 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Therefore, Plaintiff has demonstrated a genuine dispute over whether Defendants' proffered justification was pretext for gender discrimination, and, in sum, Plaintiff has submitted sufficient evidence to survive Defendants' motion for summary judgment.

**B.     Defendants' Motion to Strike**

Defendants also move this Court to strike Plaintiff's Counter-Statement of Additional Material Facts as well as Plaintiff's Exhibit FF (Dkt 108). Motions to strike are governed by Federal Rule of Civil Procedure 12(f), which provides that a court "may strike *from a pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Even assuming arguendo that it has discretion to strike the documents Defendants identify, the Court declines to do so inasmuch as the Court relied on neither Plaintiff's Counter-Statement of Additional Material Facts nor Plaintiff's Exhibit FF in its decision-making process. The motion is therefore denied. Indeed, given the argumentative nature of Defendants' Statement of Undisputed Material Facts (Dkt 101) and Plaintiff's equally-argumentative response thereto (Dkt 110-1), the Court found the entire collection of documents failed to comply with the spirit and letter of this Court's Guidelines and was wholly unhelpful in the Court's decision-making process.

**C.     Plaintiff's Motion for Default Judgment**

Plaintiff, in turn, moves for entry of default to sanction Defendants for suborning Armstrong's perjured testimony and knowingly using Armstrong's perjured affidavit in support of their motion for summary judgment (Dkt 119).  Specifically, Plaintiff identifies those portions of Armstrong's deposition testimony and affidavit concerning the company's attendance policy and Plaintiff's purported failure to adhere to it (*id.*).  Plaintiff argues that this Court's "inherent power" to sanction parties for misconduct extends to these described circumstances (*id.*).  Again, even assuming arguendo that the Court has discretion to sanction Defendants in the manner Plaintiff desires, the Court declines to do so inasmuch as the Court did not rely on the identified portion of Armstrong's deposition testimony and did not rely at all on his affidavit in its decision-making process.  This motion is therefore likewise denied.[1]

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike (Dkt 108) is DENIED, Plaintiff's Motion for Default Judgment (Dkt 119) is DENIED, and Defendants' Motion for Summary Judgment (Dkt 76) is DENIED.  An Order will be entered consistent with this Opinion.


DATED: December 17, 2012            /s/ Janet T. Neff
                                    JANET T. NEFF
                                    United States District Judge

---

[1] Moreover, as evidenced by the result reached in this Opinion, the Court observes that the parties' resources and efforts would have been better spent on working together on a resolution to this fact-laden dispute.